### HUGHES v. UNITED STATES BORAX CO.

(Circuit Court of Appeals, Ninth Circuit. January 22, 1923.)

No. 3893.

**Judgment** ☞444—**Not set aside in equity for false testimony.**

Allegations that a judgment plaintiff conspired with others to make false books and accounts, which were used in evidence on the trial of the cause, with the purpose and effect of deceiving the court, *held* not sufficient in a bill to set aside the judgment for fraud, under the established

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

rule that, to warrant such relief, the fraud must be extrinsic and collateral to the matter tried; such allegations being in effect that the judgment was procured by false evidence and perjury.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Oscar A. Trippet, Judge.

Suit in equity by J. P. Hughes against the United States Borax Company. Bill dismissed, and complainant appeals. Affirmed.

This suit was brought by the appellant in the court below to procure the annulment of a decree that had been entered by the same court against him and in favor of the appellee in a suit involving the same issues between them. Annexed to and made a part of both the original and the amended bill in the present case are certain portions of the proceeding in the former suit, including the opinion of the judge deciding it, which we here insert, as it clearly shows, not only the nature of the controversy, but the extended time afforded the respective parties by the court in the original case to present whatever evidence they had or could get and the careful consideration that it received. The opinion is as follows:

"This is a suit to quiet title to 12 lode mining claims. The defendant claims title by reason of mining locations made upon the same ground claimed by the plaintiff. Defendant's claim is that the plaintiff forfeited its title by failure to do assessment work and had not resumed work upon the claims prior to the defendant's location of the ground. The plaintiff located about 17 years ago a great many claims upon ledges containing borax in Death Valley. The plaintiff's locations were all in due and regular form, and plaintiff has been in possession of the claims in controversy from the time they were located to the present time. Plaintiff claims to have done the annual assessment work thereon from the time of location. The defendant made his locations in 1916 and 1917, upon the ground in controversy claimed by the plaintiff, and claims that the plaintiff did not do the assessment work upon the claims in dispute for the year prior to the defendant making his locations.

"Death Valley, as every one knows, is a dense desert. It is remote from any settled or populated part of the country. It is forbidding and desolate— a wilderness and solitary place that will never blossom as the rose. There is a railroad within 10 to 14 miles from the claims in dispute. This railroad furnishes a convenient place from which supplies may be conducted to the mining locations, for the purposes of working the same. Work done upon the mines in 1915 and 1916 was the same in all essential particulars. It will not be necessary, therefore, to go into the question of what work was done by the plaintiff on these claims in both years. A statement of the work done in 1916 will suffice for the purpose of illustrating the controversy in deciding the question.

"In the fall of 1916, the plaintiff had 54 mining locations. Early in the fall of 1916, the plaintiff undertook to do the assessment work upon all the 54 claims. To do this assessment work, plaintiff procured a six-horse team, established a camp at a place called Corkscrew, near where a group of these mines were located, and later on established a camp called Blanco, near where the other group of these mines were located. The camp consisted of appropriate tents and equipment for boarding the men. The plaintiff secured a crew to do this work and conveyed them to this first camp. This crew consisted of a foreman, a cook, a waiter, 18 miners, and a driver of the six-horse team. The plaintiff previously had developed or caused to be developed a spring of water and built a pipe line to convey the water to certain tanks, which were erected or caused to be erected by the plaintiff near the highway leading from the railroad to the camps. Plaintiff

procured the water for those camps from these tanks. These tanks, and in fact all the mines, are more or less near Arroyo Seco, called Furnace Creek wash. Much of the road from the railroad station to the camp is in the bottom of this wash, and it was necessary in 1916 to do a small amount of work on this road in order that it might be passable. It was, however, a good desert road. But whether it was a public highway or not is uncertain. There is no evidence that the public ever did any work on it.

"There is in the vicinity of these mines, and near the mines and the railroad, a ranch called the Furnace Creek ranch. From this ranch the plaintiff procured the team of horses, the feed for the horses, and wood and fresh meat for the camps. Near the ranch, upon government land, there is growing a timber called mesquite. Indians were employed to cut wood from this mesquite. This wood was first conveyed to the ranch, and subsequently hauled to the camps by the six-horse team. During the time of doing assessment work, the plaintiff kept the six-horse team at work almost continuously, carrying provisions and hauling water and wood to the camps. There is some controversy as to what the team was worth, and into that controversy is entered a subordinate controversy concerning two horses, which were owned by the driver and worked in the team as an inducement to the plaintiff to feed his said two horses. This subordinate controversy was injected into the case for the purpose of showing that the plaintiff's team was not a very good team, and that it was not entitled to be considered as costing the plaintiff much for the use of the team. The evidence shows that the plaintiff with its crew did 10 or 11 days' work, with two miners, upon each of these claims; in other words, that the plaintiff did 20 or 22 shifts of work on each of the 54 claims.

"I am of the opinion that the evidence fairly shows that there were 22 shifts of work upon each claim in controversy. Of course, we are not interested in what the plaintiff did concerning any of the claims not here in controversy, except in so far as it may be necessary to consider said work in determining what work the plaintiff did upon the claim in controversy. The plaintiff employed the miners at the rate of $3.50 a day, with the understanding that the plaintiff should deduct from the pay of the miners $1 a day for board. The plaintiff claims that the cost of maintaining these camps and boarding these men was very much greater than $1 a day, and that, besides the provisions and preparing the same for the men, and superintending the work, plaintiff should be allowed the reasonable value of the water used in the mining camps, and the reasonable value of the use of the tools and equipment of the mining camps. The plaintiff, besides proving by its foreman what work was done by the men (that is to say, the number of days they worked and the amount of work done on each claim), introduced several mining engineers, who amply qualified as witnesses, and who testified in an expert way concerning the value of the work done and the cost of getting it done under the circumstances in the case. One of these witnesses, who testified for the plaintiff, but more favorably for the defendant, than any other of the witnesses, has furnished a statement concerning his testimony, giving a general illustration of the plaintiff's claim, which is as follows:

"Estimate for group of 18 miners, foreman, cook, and swamper, six-horse team, and driver for hauling all supplies:

| | |
|---|---|
| Wages of one man per day | $2.50 |
| Provision per day | 1.00 |
| Water per man per day | .20 |
| Cooking per man per day | .34 |
| Fuel per man per day | .05 |
| Hauling per man per day | 1.22 |
| Insurance at 8 per cent | .28 |
| Supervision (foreman at $4.50) | .25 |
| Powder, fuse, caps, candles | .52 |
| Usage of tools and equipment, also camp equipment | .25 |
| Cost of water for team | .20 |
| | |
| Total cost, worth and value per shift | $6.81 |

"The plaintiff contends that, by doing the work in this wholesale way, these 54 claims and also the 12 claims in controversy could be worked to much greater advantage than by having one man fitted out to go to these claims and do the assessment work on one claim. For instance, the same witness that makes the above estimate, giving the cost of doing the work in a wholesale way, for one man at $6.81 per shift, or $149.82 per claim, estimates that one man undertaking to do the assessment work upon one claim would be as follows:

"Estimate of cost for one-man assessment work at Corkscrew Camp, near Ryan, Death Valley. Cost and value of one day's work of his own time:

| | |
|---|---:|
| Wages per day | $2.50 |
| Provisions per day | 1.00 |
| Horse hire per day | 1.00 |
| Horse feed per day | 1.00 |
| Wagon hire | .50 |
| Water for horse and man | .30 |
| Fuel | .05 |
| Powder, fuse, caps, candles | .45 |
| Transportation of water and supplies | .45 |
| Four days' water, two days' supplies | 1.50 |
| Use of tools, camp equipment, blacksmith, coal, etc. | .25 |
| | |
| Total cost, worth and value per shift | $9.05 |

"It will therefore be seen that, according to this witness' testimony, a great deal can be saved in the wholesale way that plaintiff did the work, rather than hire a man to do the assessment work on one particular claim. The engineer experts all estimate the amount of work done by the plaintiff in 1916 upon these claims as ranging from $140 to $170 a claim.

"Referring to the statement first above quoted, concerning the doing the work in a wholesale way: Suppose that the following items, to wit, water used per man per day, 20 cents; cooking, 34 cents; fuel, 5 cents; hauling, $1.22; and water for horses 20 cents—making a total of $2.01—be eliminated from the above estimate, that would still give $4.80 per shift, making $105.60 per claim for the work. It is not necessary for the court to decide that the above-mentioned items could not be allowed in the estimate. These items should, at least, be taken into consideration in determining whether or not $1 a day is a reasonable price for boarding the men. Nor more is it necessary for the court to decide that insurance could or could not be allowed, though I am strongly of the opinion that the insurance ought to be considered as a part of the cost of doing the work, whether there was insurance or not.

"The above statements are made by an expert, simply from estimates. Mr. Faulkner, who kept the accounts of the company, testified that the actual cost of doing the work was $6.86 per day, or $150.92 per claim. This estimate of Faulkner does not include insurance.

"The defendant's evidence tends to show that these 18 miners did not do honest work; that is to say, that they loafed on the job. That the practice adopted by the foreman of putting two men to work on each claim, instead of putting one man to work on each claim, was a great disadvantage, because two men worked at a disadvantage, and that a great deal more work would have been done if only one man worked upon a claim. The defendant's evidence tends to show that in some instances, if the men had worked separately, one man could have done approximately two-thirds as much as both men did. The defendant's strongest contention is, however, that this work could have been contracted for and that a great deal more work could have been done if the men had been hired by contract. The defendant contends that the evidence shows that one man could have gone out by himself upon these desert claims, supplied himself, and have done more work than any one man did in the plaintiff's crew. The defendant's testimony relates to what he himself could do as a miner, and the defendant's statement concerning how the work could be done cheaper than the plaintiff did it, may

be summarized by the statement handed to the court by the defendant. This statement is as follows:

Contract Price for Twelve Claims Done by Two Men at $3.50 per Foot.

Total feet, 12 claims.............................................342⁶/₇ feet
Or per claim.......................................................... 28⁴/₇ "
Two men work two tunnels, advance each tunnel.................. 1½ "
Total advance per day.............................................. 3 "
Total time—double shifts...........................................114⅓ "

### Expenses.

Total outfit.............................................$ 75.00
Wood ................................................... 1.75
Estimated cost of 2 feet round blasting 40 per cent. powder at 20 cents—total................................. .80 per 2 feet.
Total cost of 343 feet blasting........................... 137.20
Hauling grub............................. 920 pounds
Blasting material......................... 460 pounds
Coal ..................................... 50 pounds
Total ....................................1,430 pounds
Outfit ...................................200 pounds 30.00
Coal ..................................................... .75
Food at 75 cents per day per man; 2 men, 115 days........ 172.50
Water, 2 trips at 7 gallons per day; 2 men, 805 gallons.... 20.00
Wood hauled—one cord................................. 10.00

Contract price........................................$1,200.00
                                                                    448.00
Expenses ............................................. 448.00
                                                     ─────────
                                                      $752.00

"Leaving for two men for 115 shifts each—net per shift, $3.28. This statement, I believe, is not in evidence, nevertheless I think the facts may fairly be deduced from the testimony of the defendant.

"In determining whether or not the plaintiff did the assessment work, the following principles of law must be taken into consideration by the court: The law does not favor forfeitures. The burden of proof is upon the one claiming the forfeiture to show that a forfeiture has occurred. Where an owner has in good faith endeavored to do the assessment work as required by law, it will weigh heavily in his favor as against a forfeiture. Where an owner has made certain improvements, or caused certain work to be done, acting honestly and in good faith, the court will not set up its judgment as against the opinion of the owner, concerning how the improvements should have been made or the manner in which the work should have been done. It is the duty of the owner of a mine to see that the work has been done, and, where a forfeiture is claimed, it may be shown in favor of the forfeiture that the owner was imposed upon by dishonest employés who loafed on the job.

"There are only three methods of proving the value of anything: First, by establishing the price at which the thing will sell; second, by establishing what revenue it will produce; and, third, by establishing the necessary and reasonable cost of producing the thing. It is plain that the first two methods must be eliminated, and the value here can only be established by the third method. The defendant has referred many times to the value of the work to the government. The work done upon those mines is of no value or consequence whatever to the government, except in so far as the government may be interested in enforcing the law. The work may be of value to the owner, or, if the claim is abandoned or forfeited, the work may be of value to a subsequent locator.

"We come, then, to consider what is the necessary and reasonable cost of doing the work that the plaintiff did upon these claims. The defendant contends that the work could have been done much cheaper by contract than by

employing labor by the day. Plaintiff, however, had a right to undertake to do it by employing men to work by the day. This cannot be gainsaid. Let us, then, consider the necessary and reasonable cost of doing the work in the manner in which the plaintiff undertook to do it. In determining this question, it is the duty of the court to take into consideration the location of these mines, the distance from markets, the difficulty in getting to the mines and the burden of supplying the men at work. Such proof was introduced concerning what it would cost to board the men at the mines. The plaintiff's evidence tends to show that it actually cost them much more to board the men than what was deducted from their wages. If it did cost the plaintiff more, than the plaintiff is entitled to have that fact considered, notwithstanding the arrangement made with the men, concerning the stipend they should receive, and the amount they should pay for their board.

This may be illustrated thus: Suppose plaintiff had agreed to pay the men $5 a day with the understanding that plaintiff would deduct $2.50 a day for the board of the men, would not the defendant have claimed in that case that he would not be bound by any such agreement? Evidence was introduced concerning the price of board at various places. It is unnecessary, however, for the court to determine accurately what it did cost the plaintiff to board the men. The circumstances proven concerning the boarding of the men, the supplying of the camps, and the employment of a team, tend to show that the plaintiff was acting honestly. The foreman employed by the plaintiff is a competent man. He is rather an unusual man in his ability to perform that kind of work, having been at it most of his life and being a very intelligent man. His evidence shows that he has a most remarkable memory. He gave his evidence with perfect candor and frankness and impressed the court as having done the best he could under the circumstances. The men employed by the plaintiff to do the mining were miners, skilled in their trade, with the exception of one or two, who had only slight experience. Under these circumstances the court cannot say that the plaintiff did not make an honest endeavor to do the work. And the court cannot say that the foreman did not know how to get the best work out of the men.

"I am satisfied that the plaintiff did the requisite amount of work, and so hold. Let the plaintiff draw a decree in accordance with this opinion, and follow rule 45 of this court.

"Dated, August 30, 1919.                                Oscar A. Trippet, Judge."

Earle H. Smith and Albert E. Sherman, both of Los Angeles, Cal., for appellant.

James F. Peck, of San Francisco, Cal., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). The ground upon which the appellant sought by the present suit to set aside the decree that was entered in the former suit was, as stated in the original bill in the present case, in substance, that a certain witness named Davies and certain experts on behalf of the complainant in that suit (appellee here) gave on that trial false testimony. In the amended bill in the present case, the ground upon which the appellant sought the annulment of the original decree is stated to be, in substance, this: That prior to the trial of the former suit the plaintiff therein conspired "with others to build up and create false facts in support of" the alleged case, which they would introduce on the trial of the case, for the purpose of defrauding the defendant thereto, and for the further purpose of deceiving the court into rendering a decree in favor of the plaintiff; that the plaintiff and its alleged conspirators knew that on the trial it would be required to prove that the amount of work done on each of the claims

during the years 1915 and 1916 was at least $100, and that the plaintiff so performed it; that it was a part of the alleged conspiracy that "certain fixed arbitrary figures were to be claimed by said plaintiff at the trial of said case as representing measurements of the amount of work done as assessment work on each of said claims during each of said years, and said conspirators agreed upon what figures should be testified to as representing said measurements, but said figures so agreed upon by said conspirators were in truth and in fact not the figures that represented the measurement of the work done on all or any of said claims during said years or either of said years, but in truth and in fact were in each instance much higher and greater than the measurement of the true amount of work actually done on each of said claims during each of said years, all of which was known to the plaintiff and each of said conspirators"; that it was a part of the alleged conspiracy that "a certain book should be offered by the plaintiff into evidence in the trial of the case, which book was to be known as Assessment Book No. 1, and was to contain a purported account of the measurements of the work done as assessment work on each of said claims during the year 1916, but which said book was not to contain a true or correct account of the measurements of the work actually done on said claims at said time, but was to contain figures exactly like the figures agreed upon by said conspirators as the figures which they had conspired for the plaintiff to falsely claim represented the true measurements of work actually done as assessment work on each of said claims during each of said years." The alleged conspiracy embraced other similar probative matters which it is unnecessary to specify.

We are of the opinion that the allegations of the amended bill above referred to do not at all take the case out of the well-established rule that frauds which will justify a court of equity in setting aside or annulling a judgment or decree of a court of competent jurisdiction are such frauds only as are extrinsic or collateral to the matter tried by the first court, and not to frauds in the matter on which the decree complained of was rendered. U. S. v. Throckmorton, 98 U. S. 61, 25 L. Ed. 93. It is useless to cite the almost innumerable cases supporting that doctrine, including the well-known case of Pico v. Cohn, 91 Cal. 129, at pages 133, 134, 135, 25 Pac. 970, at pages 971, 972 (13 L. R. A. 336, 25 Am. St. Rep. 159), where Chief Justice Beatty, speaking for the court, said:

"It is averred, and we think sufficiently shown, that upon proof of these facts there is a reasonable certainty that plaintiff would, upon another trial, gain his cause. Such being the case, is plaintiff entitled to a decree vacating and annulling the former decree on the ground that it was procured by fraud? After a careful and extended examination of the authorities, we are constrained to answer this question in the negative. That a former judgment or decree may be set aside and annulled for some frauds there can be no question; but it must be a fraud extrinsic or collateral to the questions examined and determined in the action. And we think it is settled beyond controversy that a decree will not be vacated merely because it was obtained by forged documents or perjured testimony. The reason of this rule is that there must be an end of litigation; and when parties have once submitted a matter, or have had the opportunity of submitting it, for investigation and determination, and when they have exhausted every means

for reviewing such determination in the same proceeding, it must be regarded as final and conclusive, unless it can be shown that the jurisdiction of the court has been imposed upon, or that the prevailing party, by some extrinsic or collateral fraud, has prevented a fair submission of the controversy. What, then, is an extrinsic or collateral fraud, within the meaning of this rule? Among the instances given in the books are such as these: Keeping the unsuccessful party away from the court by a false promise of a compromise, or purposely keeping him in ignorance of the suit; or where an attorney fraudulently pretends to represent a party, and connives at his defeat, or, being regularly employed, corruptly sells out his client's interest. United States v. Throckmorton, 98 U. S. 65, 66, and authorities cited.

"In all such instances the unsuccessful party is really prevented by the fraudulent contrivance of his adversary, from having a trial; but, when he has a trial, he must be prepared to meet and expose perjury then and there. He knows that a false claim or defense can be supported in no other way; that the very object of the trial is, if possible, to ascertain the truth from the conflict of the evidence; and that, necessarily, the truth or falsity of the testimony must be determined in deciding the issue. The trial is his opportunity for making the truth appear. If, unfortunately, he fails, being overborne by perjured testimony, and if he likewise fails to show the injustice that has been done him on motion for a new trial, and the judgment is affirmed on appeal, he is without remedy. The wrong, in such case, is of course a most grievous one, and no doubt the Legislature and the courts would be glad to redress it, if a rule could be devised that would remedy the evil without producing mischiefs far worse than the evil to be remedied. Endless litigation, in which nothing was ever finally determined, would be worse than occasional miscarriages of justice; and so the rule is that a final judgment cannot be annulled merely because it can be shown to have been based on perjured testimony; for if this could be done once, it could be done again and again, ad infinitum. But counsel for appellant seek to distinguish this case from those in which it has been held that a judgment will not be set aside by reason of its being based upon forged documents or perjured testimony. They say that the fraud committed by Cohn was the bribing of Johnson; that this was collateral and extrinsic; that it was not and could not have been the subject of investigation at the trial of the original action. We do not think this distinction can be maintained. The fraud which Cohn committed was the production of perjured evidence in support of his defense. The means by which he induced the witness to swear falsely was but an incident.

"It may be safely asserted that a witness does not often deliberately perjure himself, without being induced thereto by some fraudulent or corrupt practice on the part of him who gets the advantage of the perjury. It is a matter of indifference what particular form such corrupt practice takes. The evil and the wrong is in the perjury which follows. In this case the truth of Johnson's evidence was necessarily drawn in question at the trial, and determined by the decision of the court; and all that has since been discovered is another item of testimony bearing on that point. We cannot find any substantial ground upon which this case can be distinguished from United States v. Throckmorton, 98 U. S. 65, 66."

The decree of dismissal is affirmed.